IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EQUINE LEGAL SOLUTIONS, PC,

               Plaintiff,

    v.

FIRELINE FARMS, INC.,

               Defendant.

Case No.: 3:22-cv-01850-AN

OPINION AND ORDER

Plaintiff Equine Legal Solutions, PC ("ELS") brings this action against defendant Fireline Farms, Inc., alleging a copyright infringement claim under the Copyright Act, 17 U.S.C. § 101 *et seq.* On June 13, 2024, defendant filed a motion for summary judgment. On August 16, 2024, plaintiff filed a motion for summary judgment. The Court heard oral argument from the parties on January 22, 2025. For the reasons stated below, defendant's motion is DENIED, and plaintiff's motion is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). When "parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Id.* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Id.* at 325. Instead, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.*; *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Celotex*, 477 U.S. at 324.

## BACKGROUND

Plaintiff is an Oregon corporation that provides equine-related legal services. Compl., ECF [1], ¶ 4. Defendant is a Florida corporation that operates a horse ranch in Southwest Ranches, Florida. Def. Answer, ECF [34], ¶ 5; Def. Mot. for Summ. J. ("Def. Mot."), ECF [73], at 2.

Plaintiff is the registered owner of two copyrights: TX0007188695, for the work titled "Youth Visitor Release and Instructions," and TX0008398596, for the work titled "Equine Boarding Forms Package." Decl. Rachel E. Kosmal McCart Supp. Pl. Mot. for Summ. J. ("McCart Decl."), ECF [86], ¶¶ 5-6 & Exs. 1-2. On October 31, 2016, defendant purchased the "Equine Boarding Forms Package" available on plaintiff's website, a bundle that included two forms: the Boarding Stable Visitor Hold Harmless and Indemnification Agreement – Adult ("Adult Release") and Boarding Stable Visitor Hold Harmless and Indemnification Agreement – Youth ("Youth Release") (collectively, the "Forms"). *Id.* ¶¶ 7, 9-12 & Ex. 3; Decl. Robert Parker Supp. Def. Mot. ("Parker Decl."), ECF [74], ¶ 5 & Ex. 3. The Forms included standard legal language, prepared specifically for the horse rental context, and fillable blanks for defendant's customers to complete. *See* Parker Decl. Ex. 3; McCart Decl. ¶ 14 & Exs. 4-5. Defendant purchased the

2

Forms for $149.99,[1] and plaintiff delivered the Forms to defendant via email for download. *See* McCart Decl. ¶ 7 & Ex. 3; Parker Decl. Ex. 3.

Plaintiff requires its customers to enter into a license agreement ("License Agreement") before they can access the legal forms that they have purchased. McCart Decl. ¶¶ 18-19. Before defendant downloaded the Forms, it digitally accepted the terms of the License Agreement by clicking on the box titled "I Agree." *See id.* ¶ 19; McCart Decl. Ex. 6. The License Agreement provides that any customer that does not agree to the terms of the License Agreement should not click on the box titled "I Agree." *See* McCart Decl. Ex. 6. Section 2.2 of the License Agreement, titled "Use Limitation," provides in full:

> "All documents and materials on the ELS Website, including any documents, emails and other materials you may access or receive in connection with this agreement (collectively, 'ELS Materials'), are strictly for your personal use or use in your horse-related business. You may not modify (except to fill in blanks as indicated), take language from, retype or otherwise create derivative works from any ELS Materials. For your own personal use and in the ordinary course of your horse-related business, you may copy, email and otherwise distribute the ELS Materials. However, you may not post any ELS Materials to the Internet, including on your own website, and you may not sell any ELS Materials. You may not distribute any ELS Materials, by email or otherwise, unless the distribution is in connection with your personal use of the ELS Materials or the use of ELS Materials in the ordinary course of your horse-related business."

*Id.*

In 2021, defendant began working with a web developer to create a business website. Def. Mot. 2-3; *see* Decl. Kaihly Gonzalez Supp. Def. Mot. ("Gonzalez Decl."), ECF [75], Ex. 1. As part of the process, defendant provided the web developer with its business documents, including the Forms. Def. Mot. 3; *see* Gonzalez Decl. Exs. 1-2. Defendant alleges that the web developer saved the documents in a temporary online library, which was not linked to any website but was accessible through a Google search. Def. Mot. 3. The parties dispute whether that website was ever published online, but it is undisputed that the Forms were accessible at URLs connected to defendant's website. *See id.* at 3-4 (citation omitted); Gonzalez Decl. Exs. 1-2; Pl. Resp. Opp'n to Def. Mot. ("Pl. Resp."), ECF [85], at 12-13; McCart Decl. ¶¶

---

[1] The McCart Declaration supporting plaintiff's response shows an order of "Item #33 Equine Boarding Agreement Package" for $149.99. ECF [80], at Ex. 2. Defendant asserts that they purchased the Forms for $49.99, Def. Mot. 3, and the McCart Declaration supporting plaintiff's motion shows an order of "Item #11 Equine Facility Use Agreement" for $49.99, ECF [86], at Ex. 3. Regardless, it is undisputed that defendant purchased the Forms from plaintiff.

28-30.

        From time to time, plaintiff conducts internet searches to identify documents that it believes infringe on its legal forms. McCart Decl. ¶ 22; Def. Mot. 4 (citing Compl. ¶ 10). To do so, plaintiff searches for specific horse-related language that is unique to its forms—primarily phrases that describe horse-related risks and behaviors. McCart Decl. ¶ 24; Def. Mot. 4 (citing Compl. ¶ 10). On or about November 17, 2021, plaintiff conducted an internet search for the specific horse-related language and discovered the Forms that were accessible at two URLs on defendant's website. McCart Decl. ¶ 28; Def. Mot. 4 (citing Parker Decl. Ex. 4).

        Plaintiff sent takedown notices compliant with the Digital Millennium Copyright Act ("DMCA") via email to defendant on November 17, 2021, and to defendant's internet service provider ("ISP") on November 29, 2021. *See* McCart Decl. Exs. 7, 9; Parker Decl. Ex. 4. Both notices included the URLs at which the Forms were located. *See* McCart Decl. Exs. 7, 9; Parker Decl. Ex. 4. Plaintiff sent additional DMCA compliant takedown notices to defendant on December 8, 2021. McCart Decl. ¶ 33 & Ex. 8. On December 23, 2021, defendant's president called plaintiff's office to ask how defendant could still use the Forms that it purchased from plaintiff. Decl. Donna Edwards Supp. Pl. Resp., ECF [79], Ex. 1. That same day, plaintiff's employee emailed defendant stating: "Our license agreement does not allow you to post our forms on a website. . . . While you can't post them on your website, you can email them to prospective clients." *Id.* Ex. 2. On December 29, 2021, plaintiff visited the URLs where the Forms were located, and the Forms were no longer accessible at those URLs. McCart Decl. ¶ 37.

        On January 5, 2022, plaintiff conducted another search for the specific horse-related language and discovered that the Forms were again accessible at the URLs where they had previously been posted. *Id.* ¶¶ 38-40. That day, plaintiff sent an email to defendant's ISP notifying it that defendant had reposted the Forms and asking for the ISP's assistance in removing them. *Id.* Ex. 12. On January 5, 10, 13, and 18, 2022, plaintiff sent follow-up emails to the ISP. *Id.* ¶¶ 41, 43, 45, 47. Plaintiff did not receive a response. *Id.* ¶¶ 42, 44, 46. Plaintiff believes that by January 25, 2022, the ISP had disabled defendant's website. *Id.* ¶ 48.

On March 4, 2022, plaintiff conducted another search for the specific horse-related language and discovered that the Adult Release form was again posted on defendant's website, this time at a different URL. *Id.* ¶ 49. That day, plaintiff sent another DMCA compliant takedown notice via email to defendant and its new ISP. *Id.* ¶¶ 52-53 & Exs. 16-17; *see* Parker Decl. Ex. 5. On or around March 11, 2022, plaintiff determined that the Adult Release form had been removed from defendant's website. McCart Decl. ¶ 54. Defendant received a confirmation from the new ISP that the Adult Release form had been taken down. Def. Mot. 4; *see* Gonzalez Decl. Ex. 4.

On November 18, 2022, plaintiff conducted another search for the specific horse-related language and discovered that the Youth Release form was again posted on defendant's website, this time at a different URL. McCart Decl. ¶¶ 55-56. That day, plaintiff sent another DMCA compliant takedown notice via email to defendant and its new ISP. *Id.* ¶¶ 57-58 & Exs. 18-19; Parker Decl. Ex. 6. Defendant asked the web developer why defendant was still receiving these takedown notices, and the web developer provided defendant with his conversations with the new ISP trying to figure out why the Forms were still appearing online. Def. Mot. 4; *see* Gonzalez Decl. Exs. 1-2. The new ISP could not explain why the Forms were still visible but noted that it was promptly taking down the documents once they were noticed by plaintiff. Def. Mot. 4-5; *see* Gonzalez Decl. Ex. 2.

Aside from the Forms at issue in this case, defendant also purchased at least two of plaintiff's other products: a "Partial Equine Lease Agreement" on January 13, 2019, and an "Equine Facility Use Agreement" on December 29, 2019. Parker Decl. Ex. 3; McCart Decl. Ex. 3.

## DISCUSSION

Defendant moves for summary judgment on the grounds that "[p]laintiff has sold a purely utilitarian product" and "has no right under copyright law to restrict the use of these documents by claiming a limitation on online distribution[.]" Def. Mot. 5. Plaintiff moves for summary judgment on the grounds that it owns valid copyrights in the Forms, it had the exclusive right to distribute and display the Forms, and defendant distributed and displayed the Forms in violation of the License Agreement. Plaintiff also argues that defendant's infringement was willful and that plaintiff is entitled to statutory damages.

5

To prevail on a claim of direct copyright infringement, plaintiff must establish (1) "ownership of the allegedly infringed material" and (2) that defendant "violate[d] at least one exclusive right granted to" plaintiff under 17 U.S.C. § 106. *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (citations omitted).

## A.    Copyright Infringement

### 1.    *Ownership of Copyrights*

A plaintiff is "required to show registration as an element of an infringement claim." *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 988 (9th Cir. 2017) (citation omitted). "A certificate of registration from the U.S. Copyright Office raises the presumption of copyright validity and ownership." *Id.* (citation omitted).

The record shows that plaintiff owns the copyrights TX0007188695, for the work titled "Youth Visitor Release and Instructions," and TX0008398596, for the work titled "Equine Boarding Forms Package." *See* McCart Decl. Exs. 1-2. The record also shows that plaintiff's copyrights are valid and that the Forms contain the copyrighted works. Despite defendant's numerous arguments regarding the utilitarian functions of legal forms, the minimal originality contained in plaintiff's copyrighted works, and the blank forms doctrine, defendant ultimately concedes that plaintiff "has a valid copyright[] and a valid business in selling its copyrighted works." Questioning the copyrightability of plaintiff's works and discussing the applicability of the blank forms doctrine is only relevant if defendant is contesting the validity of plaintiff's copyrights, which it apparently is not.[2] Because it is undisputed that plaintiff owns copyrights of works that are contained within the Forms, plaintiff has satisfied the first prong of its copyright infringement claim.

### 2.    *Violation of Exclusive Right*

---

[2] As an example, defendant emphasizes the "thinness" of plaintiff's copyrights and the fact that copyright law does not protect purely utilitarian functions or purely legal verbiage. *See* Def. Reply Supp. Def. Mot. ("Def. Reply"), ECF [81], at 4-7. But the "thinness" of a valid copyright is relevant where a party wishes to use the facts or information contained within a copyrighted work in preparing another work, which would not infringe on a copyright "so long as the competing work does not feature the same selection and arrangement." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349 (1991). That is not the case here, as it is undisputed that the entire contents of the Forms were accessible from defendant's website.

Defendant argues that plaintiff cannot claim exclusive rights in its legal forms. Defendant also argues that if a customer already has legal rights to do something with their purchase, such as distribute the Forms online, the customer does not require a license in order to exercise that legal right. In its response and its own motion, plaintiff argues that defendant violated its exclusive distribution rights. On reply, plaintiff also argues for the first time that defendant violated its exclusive display rights.

As an initial matter, defendant's argument that plaintiff cannot claim exclusive rights in the Forms is meritless because defendant concedes that plaintiff's copyrights are valid. Thus, to establish a claim for copyright infringement, plaintiff need only prove a violation of one of its exclusive rights. *See* 17 U.S.C. § 501(a); *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 980-81 (D. Ariz. 2008).

a.     Distribution Right

Section 106(3) of the Copyright Act grants to a copyright owner the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending[.]" 17 U.S.C. § 106(3). Because the statute does not define the term "distribute," courts have interpreted the term in light of the statute's plain meaning and legislative history. *Atl. Recording Corp.*, 554 F. Supp. 2d at 981. "The general rule, supported by the great weight of authority, is that 'infringement [of the distribution right] requires an actual dissemination of either copies or phonorecords.'" *Id.* at 981 (alteration in original) (citations omitted) (quoting *Nat'l Car Rental Sys. v. Comput. Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993)); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007) ("[T]he district court's conclusion [that distribution requires an 'actual dissemination'] is consistent with the language of the Copyright Act."); *In re Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796, 805 (N.D. Cal. 2005) ("[A] copyright owner seeking to establish that his or her copyrighted work was distributed in violation of section 106(3) must prove that the accused infringer either (1) actually disseminated one or more copies of the work to members of the public or (2) offered to distribute copies of that work for purposes of further distribution, public performance, or public display."). "In the internet context, an actual dissemination means the transfer of a file from one computer to another." *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 844 (C.D. Cal. 2006), *aff'd in relevant part sub nom. Perfect*

*10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007); *see SA Music, LLC v. Amazon.com, Inc.*, Nos. 2:20-cv-00105-BAT *et al.*, 2020 WL 3128534, at *7 (W.D. Wash. June 12, 2020).

Here, it is undisputed that defendant caused the Forms to be uploaded such that the Forms were accessible at the URLs that plaintiff located. As such, defendant made the Forms available. However, "[m]erely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution." *Atl. Recording Corp.*, 554 F. Supp. 2d at 983; *see Perfect 10, Inc.*, 508 F.3d at 1162 (citations omitted) (rejecting contention that "merely making images 'available' violates the copyright owner's distribution right"). There is no evidence in the record suggesting that there was any actual dissemination or transfer of plaintiff's copyrighted work through defendant's posting of the Forms on the internet. Plaintiff concedes that "[j]ust how many times third parties accessed and downloaded [p]laintiff's copyrighted work during the six occasions it was available on [d]efendant's website is unknown." Pl. Reply Supp. Mot. for Summ. J. ("Pl. Reply"), ECF [93], at 3. Plaintiff asserts that this information should have been in defendant's control and produced in discovery and speculates that "numerous third parties likely accessed and downloaded [p]laintiff's copyrighted work from [d]efendant's website." *Id.* However, plaintiff ignores the fact that to prevail on a copyright infringement claim, it has the burden to *prove* that there was actual dissemination; plaintiff cannot merely speculate that an absence of evidence means that there could have been actual dissemination. Moreover, there is no evidence that defendant intended to sell, lease, or otherwise transfer ownership of the Forms by causing the Forms to be posted online. Accordingly, plaintiff has not established that defendant violated plaintiff's exclusive distribution rights.

      b.     Display Right

Although plaintiff argues that defendant violated its exclusive display rights for the first time on reply, the Court exercises its discretion to consider the merits of this argument.[3] *See Flathead-*

---

[3] Although defendant never moved for leave to file a surreply, one week before oral argument, the Court ordered the parties to be prepared to discuss the scope of the exclusive display right. *See* Order of January 15, 2025, ECF [98]. During oral argument, defendant had the opportunity to and did respond to plaintiff's display rights argument.

*Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188-89 (9th Cir. 2024). Section 106(5) of the Copyright Act grants to a copyright owner of a literary work the exclusive right "to display the copyrighted work publicly[.]" 17 U.S.C. § 106(5). A literary work is a work "expressed in words . . . regardless of the nature of the material objects[.]" 17 U.S.C. § 101.

Plaintiff asserts that its copyrighted works are literary works. During oral argument, defendant disputed this characterization, asserting that plaintiff's copyrighted works have only a utilitarian function and minimal originality. However, a literary work requires only minimal originality. *See* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.04[A] (internal quotation marks omitted) ("The use of the term 'literary' in this context does not connote any criterion of literary merit or qualitative value."); *cf. Feist Publ'ns, Inc.*, 499 U.S. at 345 ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying."). Moreover, because defendant concedes the validity of plaintiff's copyrights, defendant necessarily concedes the originality of the underlying works. *See Feist Publ'ns, Inc.*, 499 U.S. at 346 (explaining that "[o]riginality is a constitutional requirement" for a work to be copyrightable). Accordingly, plaintiff's copyrighted works are "literary works" to which the exclusive display right applies.

Because plaintiff has exclusive rights to display its literary works, the Court must next examine whether posting the Forms on the internet in a manner such that only plaintiff could locate them violates plaintiff's display rights. In *Perfect 10, Inc.*, the Ninth Circuit reviewed the plain language of section 106(5) and held that "a computer owner that stores an image as electronic information and serves that electronic information directly to the user ('i.e., physically sending ones and zeroes over the [I]nternet to the user's browser') is displaying the electronic information in violation of a copyright holder's exclusive display right." 508 F.3d at 1159-60 (alteration in original) (citation omitted). However, the court also held that "the owner of a computer that does not store *and serve* the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information." *Id.* (emphasis added) (citation omitted). Similarly, in *VHT, Inc. v. Zillow Group, Inc.*, the Ninth Circuit rejected a plaintiff's contention that the defendant violated the Copyright Act by making images "available for public

display," reasoning that "[t]his theory presumes that the Copyright Act's display right encompasses an exclusive right to 'make available for display,' a position neither supported by the statute nor embraced by this court." 918 F.3d 723, 736 (9th Cir. 2019) (citing *Perfect 10, Inc.*, 508 F.3d at 1160 (9th Cir. 2007); 17 U.S.C. § 101).

However, in *Bell v. Wilmott Storage Services*, the Ninth Circuit held that even though a member of the public could not access a photo by simply visiting the defendant's website, the defendant still publicly displayed the photo. 12 F.4th 1065, 1073 (9th Cir. 2021). The plaintiff in *Bell* frequently used reverse image searches to monitor infringing uses of the photo at issue and found the photo on a server database associated with the defendant's website through one of those searches. *Id.* at 1069-70. The average internet user would not have been able to access the photograph on the defendant's website; rather, the image was only accessible to those who conducted a reverse image search or knew the precise address of the image database archiving the photograph. *Id.* at 1070. Despite the facts that the photo was only accessible to members of the public if an individual knew how to access it and that Google never indexed the photo, the court found that "[b]y displaying the [] photo on a server that was publicly accessible to anyone with an Internet connection, . . . [the defendant] publicly displayed the photo, regardless of whether or not any particular person actually found and viewed it." *Id.* at 1073 (citation omitted). The court further found that "[the plaintiff did] not need to prove that there was some minimum number of users who in fact accessed the [] photo to make out a prima facie case of infringement." *Id.* at 1074 (citing *Perfect 10, Inc.*, 508 F.3d at 1159).

The facts of this case are analogous to those in *Bell*. Like the plaintiff in *Bell*, plaintiff frequently conduct searches of the unique language it uses in the Forms to identify potential infringing uses. Plaintiff found the Forms on defendant's website through these searches. It is undisputed that the Forms were accessible on defendant's website, even if only temporarily. Even though it is likely that no other user would be able to find the Forms, by displaying the Forms on a webpage that was publicly accessible to anyone with an internet connection, defendant "publicly displayed" the Forms. *See id.* at 1073. This is true even though there is no evidence that any member of the public found or viewed the Forms, as plaintiff

need not show any "minimum number of users who in fact accessed the [Forms through the website] to establish a prima facie case of infringement." *Id.* at 1074. Accordingly, plaintiff has established that defendant violated plaintiff's exclusive display rights.

Because plaintiff has shown that defendant violated one of plaintiff's exclusive rights, plaintiff has established the second prong of its copyright infringement claim.

    3.    *Defenses*

Defendant raises a number of defenses to argue that it is not subject to liability for copyright infringement. The Court addresses each argument in turn.

    a.    License Agreement

Defendant argues that its use of the Forms was within the permitted uses under the terms of the License Agreement. Plaintiff argues that the License Agreement explicitly prohibits posting the Forms on the internet.

The existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement. *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) (citations omitted). "Nevertheless, when the contested issue is the scope of a license, rather than the existence of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized under the license and the license need not be pleaded as an affirmative defense." *Straughter v. Concord Music*, No. ED CV 19-1360-JFW(SHKx), 2021 WL 160709, at *7 (C.D. Cal. Jan. 8, 2021) (internal quotation marks omitted) (quoting *Sohm v. Scholastic Inc.*, 959 F.3d 39, 48 (2d Cir. 2020)); *see LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1156 (9th Cir. 2006), *overruled on other grounds by Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011). Here, the parties agree the License Agreement exists but dispute its scope.

Principles of contract law apply to the construction of copyright licenses and other transfers of rights. *Allegro Corp. v. Only New Age Music, Inc.*, No. 01-790-HU, 2002 WL 32806161, at *5 (D. Or. Oct. 4, 2002) (citation omitted), *report and recommendation adopted*, 2003 WL 23571745 (D. Or. Jan. 23, 2003). "Interpretation of a contract is a matter of law[.]" *United States v. King Features Ent., Inc.*, 843

F.2d 394, 398 (9th Cir. 1988). The License Agreement provides that it "is governed by the laws of the State of Oregon." McCart Decl. Ex. 6.

Under Oregon law, to interpret a contractual provision, the court first "examines the text of the disputed provision[] in the context of the contract as a whole." *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997) (en banc). If the provision is unambiguous, the analysis ends, and the court construes the term as a matter of law. *Id.*; *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379-80, 271 P.3d 103 (2011) (citation omitted).

In addition, the construction of a copyright license must be consistent with federal copyright law and policy. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (citation omitted); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989) (citing *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988); *Harris v. Emus Recs. Corp.*, 734 F.2d 1329, 1334 (9th Cir. 1984)). "Chief among these purposes is the protection of the author's rights." *S.O.S., Inc.*, 886 F.2d at 1088 (citing *Cohen*, 845 F.2d at 854). Copyright licenses are therefore "assumed to prohibit any use not authorized." *Id.* (citations omitted).

Section 2.2 of the License Agreement is titled "Use Limitation" and describes how defendant may and may not use plaintiff's legal forms, such as the Forms. The provision allows some types of distribution, such as by email, but explicitly states that customers "may not post [the Forms] to the internet, including on [the customer's] own website." McCart Decl. Ex. 6. Defendant's argument that the terms of the License Agreement allowed particular kinds of distribution is unavailing because the provision unambiguously prohibits defendant's exact conduct here—posting the Forms online. Additionally, the Court's construction is consistent with the purposes of copyright law. A breach of this provision clearly encroaches on plaintiff's exclusive rights to reproduce, distribute, and display its works, which are conferred upon plaintiff by the Copyright Act. In the absence of the License Agreement, which by its nature allows defendant to use the Forms in certain ways, any method of distribution, including posting the Forms on the internet, would infringe on plaintiff's exclusive rights. Because the License Agreement unambiguously prohibits posting of the Forms on the internet, plaintiff has established that defendant's conduct was not

authorized by the terms of the License Agreement.

b.    Implied License

Defendant next argues that its acts were permitted by an implied license.  An implied license exists when (1) the licensee requests the creation of a work; (2) the licensor creates the work and delivers it to the licensee who asked for it; and (3) the licensor intends that the licensee copy and distribute the work.  *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (citation and footnote omitted).  However, none of these conditions are met here.  Defendant never requested the creation of the Forms; plaintiff created the Forms on its own initiative and sold them to defendant as part of its business.  Accordingly, there is no implied license.

c.    First Sale Rule

Although defendant never explicitly argues the first sale rule as a defense, defendant raises the first sale rule at various points in its briefing.  The first sale rule, set forth in section 109, provides that a copyright owner's exclusive right of public distribution under section 106(3) may terminate with respect to a particular copy of a work that has been lawfully made and sold.  17 U.S.C. § 109(a).  "[O]nce the copyright owner places a copyrighted item in the stream of commerce . . . , he has exhausted his exclusive statutory right to control its distribution."  *Quality King Distribs., Inc. v. L'Anza Rsch. Int'l, Inc.*, 523 U.S. 135, 152 (1998).  However, "[t]he first sale doctrine does not apply to a person who possesses a copy of the copyrighted work without owning it, such as a licensee."  *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010) (citations omitted).  Accordingly, the parties spill much ink disputing whether plaintiff sells its legal forms or merely "licenses to access and use" its legal forms.  Compl. ¶ 1; *see* Def. Mot. 8-10; Pl. Mot. 3-5.

Because plaintiff does not show that defendant violated its exclusive distribution right, the first sale rule does not apply.  *See Vernor v. Autodesk, Inc.*, 555 F. Supp. 2d 1164, 1170 n.4 (W.D. Wash. 2008) (emphasis in original) (citing *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 103 (9th Cir. 1960)) (noting that in *Hampton*, "there was no first sale issue, but rather a dispute about whether the defendant could *display* the movie").  Accordingly, the Court does not reach the question of whether

defendant owns a copy of the Forms or merely a license to use the Forms.

             d.        DMCA Safe Harbor

           Finally, defendant argues that it complied with the DMCA and is entitled to safe harbor. The DCMA provides that a "service provider" is not liable for copyright infringement if, in relevant part, the material was made available online by a person other than the service provider and is only intermediately or temporarily stored on the service provider's system, *see* 17 U.S.C. § 512(b)(1), or the service provider does not have knowledge of the infringing material and "acts expeditiously to remove, or disable access to, the material[,]" *id.* § 512(c)(1). A service provider is either "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received[,]" or "a provider of online services or network access, or the operator of facilities therefor[.]" 17 U.S.C. § 512(k)(1)(A)-(B). However, defendant is not a service provider. Moreover, defendant caused the Forms to be made available online; it was not merely an entity that facilitated transmission of the Forms. Accordingly, the DCMA safe harbor defenses do not apply to defendant.

**B.**      **Statutory Damages**

           Because plaintiff has established a claim of copyright infringement and none of defendant's purported defenses apply, the Court turns to the question of damages. Plaintiff has elected to recover statutory damages, which it is entitled to regardless of whether "there is adequate evidence of the actual damages suffered[.]" *L.A. News Serv. v. Reuters TV Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (internal quotation marks omitted) (quoting *Harris*, 734 F.2d at 1335); *see* 17 U.S.C. § 504(c)(1).

           "When a plaintiff demands more than the minimum amount of statutory damages in a copyright infringement action and a party demands a jury trial, the Seventh Amendment entitles that party to have a jury decide the amount of statutory damages." *Reed v. Ezelle Inv. Props. Inc.*, 353 F. Supp. 3d 1025, 1037 (D. Or. 2018) (footnote omitted). Here, the parties confirmed during oral argument that they both waived their right to a jury trial. Accordingly, this Court may award statutory damages on summary judgment. *See* Fed. R. Civ. P. 38(d).

Under section 504, a court may award statutory damages of "not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). If the infringement was "innocent," a court may reduce the award of statutory damages to as low as $200. *Id.* § 504(c)(2); *see Reed*, 353 F. Supp. 3d at 1036. To prove innocent infringement, the defendant must show that it "was not aware and had no reason to believe that [its] acts constituted an infringement of copyright[.]" 17 U.S.C. § 504(c)(2). If the infringement was "willful," a court may increase the award to $150,000. *Id.* To prove willful infringement, the plaintiff must show that (1) the defendant was actually aware of the infringing activity, or (2) the defendant's actions were the result of "reckless disregard" for, or "willful blindness" to, the copyright holder's rights. *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011).

"The court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Harris*, 734 F.2d at 1335 (footnote omitted) (citing *L.A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100 (1919)). "Within these limitations the court's discretion and sense of justice are controlling[.]" *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990) (internal quotation marks omitted) (quoting *F.W. Woolworth Co. v. Contemp. Arts*, 344 U.S. 228, 232 (1952)). To determine the amount of statutory damages, courts consider factors such as:

> "(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant."

*Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 926, 928 (N.D. Cal. 2009) (internal quotation marks omitted) (quoting *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1237 (E.D. Cal. 2008)).

Plaintiff argues that it is entitled to an award of $75,000 because defendant willfully infringed plaintiff's copyrights, or in the alternative, $30,000 if the Court does not find that defendant's infringement was willful. Defendant argues that plaintiff is entitled to only $400, equal to two innocent infringements, or in the alternative, $1,900, equal to two minor infringements and four innocent infringements.

The Court addresses the factors in turn. First, regarding expenses saved and profits reaped, plaintiff concedes that "[it] has no reason to believe [d]efendant profited by posting the [Forms] on its website." Pl. Mot. 11. Plaintiff offers no evidence of expenses saved or profits reaped by defendant.

Second, regarding revenues lost, plaintiff states that "it is impossible to calculate how many sales [p]laintiff lost as a result of the [Forms'] presence on [d]efendant's website." *Id.* Plaintiff also offers no evidence of its revenues lost.

Third, regarding the value of plaintiff's copyrights, plaintiff argues that "the Boarding Forms Package, of which the [Forms] are an integral part, is a cornerstone of [p]laintiff's business" because it is plaintiff's best-selling and most expensive product, currently priced at $199.99. *Id.* at 12; *see* McCart Decl. ¶¶ 74-75. Plaintiff also argues that the horse industry is "far from a niche business – there are 6.65 million horses in the United States that add $177 billion to the United States economy." *Id.* (citation omitted). While these statements indicate that plaintiff's two copyrights have value, nothing in the record helps the Court determine what that value is.

Fourth, regarding the deterrent effect to others, plaintiff asserts that "[c]opyright infringement has become an increasing problem for [p]laintiff, and infringers and website hosts alike are increasingly unresponsive to DMCA notices." *Id.*; *see* McCart Decl. ¶ 26. While that may be plaintiff's experience as a general matter, nothing in the record supports this assertion.

Fifth, regarding whether defendant's conduct was willful or innocent, plaintiff identifies six instances in which the Forms were accessible on defendant's website, and defendant does not dispute that these instances occurred. It is also undisputed that defendant received five DMCA notices relating to the Forms. However, no evidence in the record shows that defendant was aware that the Forms were publicly accessible on its website before it received the DMCA notices. In fact, the evidence shows only that after defendant received each of the DMCA notices, either directly from plaintiff or through its ISP, defendant worked to have the Forms removed from the website and cease the infringing conduct. Plaintiff appears to argue that the fact that defendant's president called plaintiff's office to ask how defendant could still use the Forms is evidence of defendant's actual knowledge, but that only indicates that defendant was

asking how it could use the Forms that it had already purchased from plaintiff. Nothing in the record supports a finding of willful infringement. On the contrary, the evidence shows that defendant "was not aware and had no reason to believe that [its] acts constituted an infringement of copyright[.]" 17 U.S.C. § 504(c)(2). Accordingly, the Court finds that defendant's infringement was innocent.

Sixth, regarding defendant's cooperation, plaintiff argues that "[d]efendant did not produce a single record that would allow [p]laintiff to glean any insight into the breadth of [d]efendant's internet distribution of [p]laintiff's copyrighted works. Moreover, [d]efendant was uncooperative in general with the discovery process." Pl. Mot. 13 (citing McCart Decl. Exs. 33, 40). The only evidence plaintiff cites to is defendant's second supplemental response to plaintiff's first request for production, in which defendant's counsel responded that defendant did not have custody or control of the documents that plaintiff requested. *See id.* This is not evidence of non-cooperation, and plaintiff presents no other evidence to support its assertion.

Seventh, regarding the deterrent effect to defendant, plaintiff argues that "[t]he probability of [d]efendant infringing [p]laintiff's copyrights again in the future seems high" and that "[c]learly, it will take more than [d]efendant has spent in legal fees on this case to deter [d]efendant from further infringement." Pl Mot. 13-14. Plaintiff appears to believe that just because defendant did not comport with plaintiff's approach to litigating this case—*e.g.*, by litigating to the summary judgment phase and retracting a settlement offer—defendant must have acted in bad faith and should be deterred. This is not evidence of a need to deter defendant. Evidence in the record shows that defendant purchased at least two other forms of plaintiff's. Parker Decl. Ex. 3; McCart Decl. Ex. 3. However, nothing in the record suggests, nor does plaintiff allege, that defendant has used either of these products in a manner that infringes on plaintiff's copyrights. Accordingly, the need to deter defendant appears to be minimal.

Taking the above factors into consideration, the Court concludes that because defendant's infringement was innocent, there is no evidence of profits reaped or revenues lost, and the need for deterrence is minimal, a statutory award of $200 for each work infringed is just in this case. During oral argument, plaintiff represented that the Forms represented two works, which defendant did not dispute.

Accordingly, a total statutory award of $400 is appropriate.

**C.    Attorney's Fees and Costs**

The court may award full costs and "a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. As the prevailing party, plaintiff is entitled to recover costs and reasonable attorney's fees.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment, ECF [73], is DENIED, and plaintiff's Motion for Summary Judgment, ECF [85], is GRANTED. Defendant shall pay plaintiff $400 in statutory damages for infringing the copyrighted works in the Forms. Judgment shall be entered on behalf of plaintiff.

IT IS SO ORDERED.

DATED this 12th day of February, 2025.

Adrienne Nelson
United States District Judge